UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TVPX ARS INC., as Securities Intermediary for CONSOLIDATED WEALTH MANAGEMENT, LTD., on behalf of itself and all others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>                Defendant. | Civil Action No. 18-cv-02989-RBS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff TVPX ARS Inc. ("plaintiff"), on behalf of itself and all others similarly situated, for its First Amended Complaint against defendant Lincoln National Life Insurance Company ("Lincoln"), states as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by Lincoln. Plaintiff seeks to represent a class of Lincoln policyholders who have been forced to pay unlawful and excessive cost of insurance ("COI") charges by Lincoln.

2. Plaintiff, along with numerous other Lincoln policyholders, has been forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts. The subject Lincoln policies specify that monthly cost of insurance ("COI") rates "will be determined by the Company, based on its expectations as to future mortality experience"– and

nothing else. Lincoln also contractually promised to determine the cost of insurance on a monthly basis.

3. Nationwide mortality experience has *improved* significantly over the past several decades. Lincoln's expectations as to future mortality experience have likewise substantially changed in its favor. Insureds are living longer than Lincoln originally anticipated when the policies at issue were first priced. That is one reason that Lincoln has repeatedly stated in regulatory filings that mortality experiences were substantially better than it expected. Despite this improved mortality experience, Lincoln has not lowered the COI rates it charges its customers.

4. Universal and variable life policies combine death benefits with a savings or investment component, often known as the "account value." The COI charge is deducted outright from the policy owner's account value, so the policyholder forfeits the COI charge entirely to Lincoln. The COI charge is supposed to compensate Lincoln for mortality risk – the expected probability that the insured for that particular policy will die in a particular year. Indeed, Lincoln's corporate parent, Lincoln National Corporation ("LNC") specifically refers to COI charges as "mortality charges." The payment of COI charges to cover Lincoln's mortality risk is the policy's insurance component, and Lincoln contractually agreed to base its COI rate *only* on mortality. The COI charge is deducted on a monthly basis, and it is calculated by multiplying the applicable "COI rate" by the insurer's net amount at risk. As LNC explains: "In a UL contract, policyholders have flexibility in the timing and amount of premium payments and the amount of death benefit, provided there is sufficient account value to cover all policy charges for mortality and expenses for the coming period." LNC further explains that "[m]ortality charges are either

specifically deducted from the contract holder's policy account value (i.e., cost of insurance assessments or 'COI's') or are embedded in the premiums charged to the customer."

5. The subject policies here each state that the COI rates Lincoln charges "will be determined by the Company, based on its expectations as to future mortality experience." This provision is referred to by the insurance industry as a "*Single* Consideration Policy Form" because the *only* factor that the carrier expressly states that it can and must consider when determining COI rates is "expectations as to future mortality experience." This provision requires Lincoln to *decrease* COI rates if it experiences an improvement in expected mortality. In other words, if Lincoln expects fewer people to die at a given rate, then it will expect to pay out fewer death benefits at a given rate. And if Lincoln pays out fewer death benefits over time, the COI rate should correspondingly decrease.

6. In the face of the substantially improved mortality experience that has benefited Lincoln, it is apparent that Lincoln has wrongly construed its policies as granting it a nonsensical "heads I win, tails you lose" power, reserving the right to *increase* COI rates if there were to be an unexpected pandemic that made mortality experience worse than anticipated, but not requiring it to *decrease* COI rates in the face of years and years of improved mortality experience—an improvement that has, in fact, already occurred.

7. Lincoln has also wrongly "based" COI rates on factors not permitted by the contract—i.e., factors other than its "expectations as to future mortality experience."

8. Lincoln's position has no merit and breaches the terms of the insurance policies. As a result of this misconduct, plaintiff seeks monetary relief for the COI overcharges that Lincoln has wrongly imposed on plaintiff and all of its similarly situated customers who each own policies with the same language at issue here.

## THE PARTIES

9. Plaintiff TVPX ARS Inc., as securities intermediary for Consolidated Wealth Management, Ltd., is a corporation organized under the laws of Wyoming with its principal place of business in Utah. Plaintiff owns a LN580 Flexible Premium Adjustable Life Insurance Policy, policy number 7144119, insuring the life of Lawrence Ripich, which was issued on or about July 18, 2002 by Lincoln and currently has a face value of $400,000 (the "Ripich Policy"). At issuance, Mr. Ripich was age 76. On information and belief, the Ripich Policy has not received any COI rate decrease since it was issued.

10. Defendant Lincoln National Life Insurance Company is a corporation organized and existing under the laws of Indiana, having its principal place of business in Radnor, Pennsylvania. Lincoln is a wholly owned subsidiary of Lincoln National Corporation, which has its principal place of business in Radnor, Pennsylvania.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

12. This Court has personal jurisdiction over Lincoln because it has its principal place of business in Radnor, Pennsylvania.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including Lincoln's COI rate overcharge.

**FACTUAL BACKGROUND**

A.  **Cost of Insurance**

14.  The Ripich policy has the following language about how the rate used to calculate the COI charge – known as the "Cost of Insurance Rate" – will be determined:

> Monthly cost of insurance rates will be determined by the Company, based on its expectations as to future mortality experience. Any change in cost of insurance rates will apply to all individuals of the same class as the insured. In determining the monthly cost of insurance, the Company will add the amount of the Flat Extra Monthly Insurance Cost, if any, show in the Policy Specifications. If the person insured is in a rated premium class, the monthly cost of insurance rates for a standard (non-rated) risk will be multiplied by the Risk Factor, if any, show in the Policy Specifications. Under no circumstances will the cost of insurance rates ever be greater than those specified in the "Table of Guaranteed Maximum Life Insurance Rates."

The Ripich Policy also provides that "[t]he cost of insurance for the insured is determined on a monthly basis." The set of policies at issue include all universal and variable universal life policies issued on the policy form of the Ripich Policy (i.e., Policy Form Number LN580 series), all policies in the Ripich Policy product line, and all policies issued by Lincoln on any Single Consideration Policy Forms.[1] These policies are referred to as "COI Class Policies." Excluded from the Class are the policies settled in the *Bezich* action against Lincoln, described in more detail below. A copy of the Ripich Policy is attached hereto as Exhibit A.

15.  The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The COI Class Policies are all contracts of adhesion.

---

[1] There are sometimes minor, yet immaterial, variations in the language used in Single Consideration Policy Forms.  For example, while the Ripich policy states that COI rates will be "based on its expectations as to future mortality experience," other Single Consideration Policies may state "based on our expectations as to future mortality experience," or "based on our expectations of future mortality experience," or "based on future mortality experience expectations."  All policies issued on any Single Consideration Policy Form are included within the proposed Class.

16. This policy language obligates Lincoln to determine its COIs every month, and provides that the *only* factor that the carrier can and must consider when determining COI rates are "expectations as to future mortality experience." Nothing else. Because the COI rates on the COI Class Policies must be based solely on expectations as to future mortality experience, COI rates must be adjusted if those expectations improve.

17. That the contract requires rates to be "based on" mortality alone is confirmed by other provisions of the contract. The policy states that the maximum COI rates that can be charged are "based . . . on" industry standard mortality tables. Those maximum COI rates are explicitly set forth in the policy and are exactly equal to the rates in those industry standard tables – i.e., the maximum COI rates are based on mortality rates and nothing else. But when it comes to charging its customers actual COI rates, Lincoln ignores the language of the policies and uses COI rates that are not "based on" its expectations as to mortality experience.

18. By contrast, Lincoln has issued other insurance policies that do not require it to base its COI rates on mortality alone when that is its intention, including a *later* version of this *same* product. For example Lincoln received permission from regulators to *change* the policy form for a later version of the policy owned by plaintiff. This form, which was issued on policy form number LN589, provided that: "Monthly Cost of Insurance rates will be determined by Lincoln Life, based on its expectations as to future mortality, **investment earnings, persistency, and expenses (including taxes)."** (emphasis added).

19. The size of the COI charge matters to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the account value (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to Lincoln (this is in contrast to the

balance of premium payments, which, after expenses are deducted, are deposited into the account value and invested on behalf of the policyholder or credited with interest by the insurance company).

20.     Lincoln has forced policyholders to pay excess COI charges by failing to adjust COI rates in the face of improving mortality, and the COI charges are in excess of what Lincoln is contractually permitted to charge to cover its mortality risks.

### B.     Improving Mortality and Lincoln's Unlawful Failure to Base COI Rates Solely on Expectations as to Future Mortality Experience

21.     Lincoln has not decreased its COI rates for COI Class Policies, despite the fact that mortality rates have improved steadily *each year* – i.e., mortality risks have gotten *better* for Lincoln over time, as people are living much longer than anticipated when the products were priced and issued.

22.     Insurers like Lincoln systematically quantify their "expectations as to future mortality experience." They perform experience studies which examine their historical mortality experience and, based on that mortality experience, develop predictions of the mortality experience they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect expectations as to future mortality experience.

23. Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

24. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.[2]

25. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that Lincoln should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table").

---

[2] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2_june01.pdf.

8

The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

26. The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

27. The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

28. The 1990-95 Basic Tables reflected the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995. The 2001, 2008 and 2015 Valuation Basic Tables each show significant mortality improvements from the 1990-95 Basic Tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. The report states: "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee (ILEC) have shown significant mortality

improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development."

29. Lincoln has repeatedly acknowledged that, consistent with industry experience, its mortality experience has been better than it expected. For example, Lincoln's parent (Lincoln National Corporation ("LNC")) has filed required interrogatory statements on behalf of Lincoln with the NAIC, in each year from 2008-2014. These are sworn statements, signed by an actuary. Each year, Lincoln answers the question "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation." In 2008, 2009, 2010, 2011, 2012, 2013, and 2014, Lincoln included the following sentence in its response to this question: "Mortality experience is also predicted to improve in the future." And in 2015, 2016, and 2017, Lincoln did not reveal any worsening mortality in answer to this question.

30. The same conclusion of "favorable" mortality experiences compared to carrier assumptions is also documented in annual reports. For example, in 2005, LNC's Life Insurance segment unlocked reserves to reflect "improved mortality assumptions." And in its Annual Report on Form 10-K filed with the SEC for fiscal year 2016, Lincoln reported that "[i]n 2016, we experienced modestly favorable mortality." And in its 10-K for fiscal year 2017, Lincoln reported that "[i]n 2017, we experienced modestly favorable mortality as compared to our expectations." Similar improved mortality assumptions were reflected in other years. LNC notes in its annual reports that the "key experience assumptions" include "mortality rates" and that

Lincoln "periodically review[s]" these assumptions, but in violation of the policy language, Lincoln did not lower COI rates to reflect these improved mortality assumptions.

31. Moreover, Lincoln loaded its COI rates with undisclosed factors other than mortality, including maintenance, administrative and other expense factors, and profit, in violation of the plain language of the contract. Indeed, LNC concedes that a major profit driver for the company is to load profit targets into its COI rates, in excess of mortality costs. It refers to this practice as generating "mortality margins." In annual reports, LNC has explained that "[m]ortality margins represent the *difference* between amounts charged to the customer to cover the mortality risk and the actual cost of reinsurance and death benefits paid," and that "[m]ortality charges" are "specifically deducted from the contract holder's policy account value (i.e. cost of insurance assessments or 'COI's')." (emphasis added). But the policies do not permit Lincoln to base its COI rates on anything other than expectations as to future mortality experience – and its avowed practice of using COI rates to generate mortality margins violates the contract. As a result, Lincoln overcharged policyholders even if expectations as to future mortality experience had never improved. This improper calculation of COI rates further damaged policyholders.

32. Lincoln also has concealed its wrongdoing: the monthly COI rates used to calculate COI charges are not disclosed to policyholders, nor are the factors Lincoln actually used to calculate those COI rates. Lincoln has never disclosed to policyholders that it is improperly using COI rates that are not based on Lincoln's expectations of future mortality experience.

## CLASS ACTION ALLEGATIONS

33. This action is brought by plaintiff individually and on behalf of the "COI Overcharge" class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

34. The COI Overcharge Class consists of:

All current and former owners of universal life (including variable universal life) insurance policies issued by Lincoln National Life Insurance Company, or its predecessors, that provide: (1) an insurance or cost of insurance charge or deduction calculated using a rate based on expectations of future mortality experience; (2) additional but separate policy charges, deductions, or expenses; (3) an investment, interest bearing, or savings component; and (4) a death benefit.

The COI Overcharge Class does not include policies subject to the settlement in the case *Peter S. Bezich v. The Lincoln National Life Insurance Company*, Case No. 02C01-0906 PL-73, in Allen County Circuit Court of Allen County, Indiana, defendant Lincoln, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

35. The class consists of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Lincoln.

36. The claims asserted by plaintiff are typical of the claims of the COI Overcharge Class.

37. The plaintiff will fairly and adequately protect the interests of the classes and does not have any interests antagonistic to those of the other members of the classes.

38. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

39. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any classes certified in this action.

40. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether Lincoln's actions in failing to decrease the cost of insurance charges imposed on the COI Overcharge Class violated the terms of those form policies;

(c) whether Lincoln based its COI charges on factors other than expectations as to future mortality experience;

(d) whether Lincoln breached its contracts with plaintiff and members of the class;

(f) whether Lincoln has experienced better mortality than it expected; and

(g) whether plaintiff and members of the Class are entitled to receive damages as a result of the unlawful conduct by defendant as alleged herein and the methodology for calculating those damages.

41. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when Lincoln's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and Lincoln's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## **FIRST CLAIM FOR RELIEF**

### **Breach of Contract**

42. Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of plaintiff and the COI Overcharge Class.

43. The subject policies are binding and enforceable contracts.

44. Lincoln breached the contract by deducting COI charges calculated from COI rates not based on its expectations as to future mortality experience. These overcharges include, but are not limited to, the excess COI charges that Lincoln deducted by not reducing COI rates based on improved mortality.

45. Lincoln's failure to decrease COI rates also violated the contracts' uniform requirement that Lincoln determine its COI charge monthly because any such determination would have shown the need to decrease COI rates based on the improved mortality.

46. Lincoln's decision to base COI rates on factors other than expectations as to future mortality alone also breaches the policy.

14

47. Plaintiff and the COI Overcharge Class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Lincoln's conduct as set forth herein.

48. As a direct and proximate cause of Lincoln's material breaches of the policies, plaintiff and the COI Overcharge Class have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the COI Overcharge Class pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding plaintiff and the class compensatory damages;

3. Awarding plaintiff and the class pre-judgment and post-judgment interest, as well as attorney's fees and costs; and

4. Awarding plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff and the class hereby demand a trial by jury as to all issues so triable.

Dated: November 5, 2018               Respectfully submitted,

*/s/ Gaetan J. Alfano*
Gaetan J. Alfano
Douglas E. Roberts
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
1818 Market Street, Suite 3402

Philadelphia, PA 19103
Tel:   215-998-1441
Fax:   215-754-5181
gja@pietragallo.com
der@pietragallo.com

Steven G. Sklaver (*pro hac vice*)
Glenn C. Bridgman (*pro hac vice*)
Bryan Caforio (*pro hac vice*)
Richard L. Jolly (*pro hac vice*)
Catriona M. Lavery (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
bcaforio@susmangodfrey.com
rjolly@susmangodfrey.com
clavery@susmangodfrey.com

Seth Ard (*pro hac vice*)
Ryan C. Kirkpatrick (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

*Attorneys for Plaintiffs*

16

**CERTIFICATE OF SERVICE**

     I hereby certify that on the 5th day of November 2018, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Eastern District of Pennsylvania, using the electronic case filing system of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

                                              *Gaetan J. Alfano*
                                              Gaetan J. Alfano